UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| CORNELIUS MILK, | 4:23-CV-04063-KES |
| Plaintiff, | |
| vs. | 1915A SCREENING |
| TRAVIS RIPPERDA, Risk Manager SDSP/D.O.C., in his individual and official capacity; UNKNOWN PERSONS AND/OR ENTITIES SYSTEM RISK MANAGEMENT TEAM, SDSP/D.O.C., in their individual and official capacities; RILEY DEGROOT, East Hall Case Mgr., SDSP/D.O.C., in his individual and official capacity; KELLIE WASKO, Secretary of Corrections, D.O.C., in her individual and official capacity; CHAD STRAATMEYER, Former System Risk Manager, in his individual and official capacity; STRAATMEYER'S FORMER SYSTEM RISK MANAGEMENT TEAM AND OTHER UNKNOWN PERSONS AND OR ENTITIES, in their individual and official capacities; DENNY KAEMINGK, Former Secretary of Corrections, in his individual and official capacity; DARIN YOUNG, Former Warden, in his individual and official capacity; MIKE LEIDHOLT, Former Secretary of Corrections, in his individual and official capacity; J.C. SMITH, SE Region Parole Supervisor, in his or her individual and official capacity; DANIEL SULLIVAN, Former Warden, in his individual and official capacity; JOSH KULM, Parole Officer, in his individual and official capacity; AMBER PIRRAGLIA, Director of Prisons, in her individual and official capacity; TERESA BITTINGER, Warden, in her individual and official capacity; UNKNOWN FORMER DIRECTOR OF PRISONS, in his or her individual and official capacity; DEPARTMENT OF | |

CORRECTIONS; PAROLE OFFICER
KAYLA OELKERS, in her individual and
official capacity; PAROLE OFFICER
JAKE ANDERSON, in his individual and
official capacity; EXECUTIVE
DIRECTOR OF PAROLE SERVICES
BRAD LEWANDOWSKI, in his
individual and official capacity,

                              Defendants.

Plaintiff, Cornelius Milk, an inmate at the South Dakota State Penitentiary, filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Docket 1. This court granted Milk leave to proceed in forma pauperis and ordered him to pay an initial partial filing fee. Docket 5. Milk timely paid his initial partial filing fee on May 1, 2023. Milk has also moved for leave to amend his complaint and for a preliminary injunction and temporary restraining order. Dockets 12, 15.

## I.      Motion For Leave to Amend Complaint

Milk has filed several documents with the court that express a desire to amend his complaint and add additional facts, relief sought, and defendants. *See* Dockets 12, 12-1, 17, 19, 20, 21, 22. Under Federal Rule of Civil Procedure 15(a)(1), "[a] party may amend its pleading once as a matter of course within . . . 21 days after serving it[.]" Because defendants have not yet been served and Milk has not previously amended his complaint, Milk is within the window provided by Rule 15(a)(1) and may amend his complaint. Milk's motion for leave to amend his complaint, Docket 12, is granted. This court will now screen Milk's amended complaint under 28 U.S.C. § 1915A.

2

## II.    1915A Screening

### A.    Factual Background

The facts alleged in Milk's complaint are: that he has been incorrectly classified as a violent inmate, causing him to be placed in high security housing while imprisoned and more restrictive parole supervision while out of prison. Docket 1-1 at 4-8. In August 2016, Milk had been incarcerated at the intake unit in the Jameson Annex of the South Dakota State Penitentiary for 60 days. *See id.* at 4. He was classified to go to the Mike Durfee State Prison, a medium security facility, but he wanted to stay in the State Penitentiary so that his family could visit him more easily and because he was more familiar with that facility. *See id.* On approximately August 12, 2016, he spoke with System Risk Manager Chad Straatmeyer, who told him that he had an upcoming assessment and that if he wanted to remain at the State Penitentiary, he should " 'throw the assessment' by 'not answering truthfully' or 'exaggerating' some of [his] responses." *Id.* Milk "altered the test by falsifying and exaggerating [his] responses." *Id.*

Approximately one year later, the parole board sought to impose his suspended time because he had received a System Risk Level 3 score on his risk assessment. *Id.* Milk notes that he was only able to view his risk report while with his attorney for a half hour that day, and he states that "from what [he] was able to read, it was completely ridiculous nonsense. Pure conjecture and speculation with no proven facts to support their conclusions." *Id.* Milk's Level 3 status kept him incarcerated for two and a half years past his initial parole date from July 2017 to December 2019 and prevented him from earning

3

work discharge credits even though he had a job while incarcerated for almost two years. *Id.* Instead of being paroled on September 13, 2019, he was sent to a minimum-security prison unit until December 13, 2019. *Id.* When paroled, he was placed on "intensive supervision[,]" the most restrictive form of parole, and he was required to wear a GPS monitor for six months after his release. *Id.*

Milk was sentenced to six years in prison with three years suspended for another conviction on December 1, 2022, but he claims that he was supposed to receive a sentence of time served because of the jail time that he had already served. *Id.* at 5. At the time that he filed his complaint on April 21, 2023, Milk alleged that he was "forced to sit in a maximum security prison on 23 hour per day lockdown even though [his] release date was October 25, 2022." *Id.* He alleges that he was told he only had to go back to prison to be assigned a new number, at which point he could go home, but instead he was incarcerated on December 9, 2022, and held for several months. *Id.*

On February 13, 2023, Case Manager Riley DeGroot told Milk that a mistake was made regarding his parole and that he was supposed to be released on October 25, 2022. *Id.* They discussed Milk's parole plan, which Milk believed to be release to his home with his fiancée[1] and stepchildren, but three days later, DeGroot informed him that he was required to go to either Glory House or the Arch, transitional facilities in Sioux Falls, when released. *See id.* DeGroot later told Milk that the Arch would not work because his

---

[1] Milk refers to his fiancée in an attachment to his original complaint and in one supplement, and he refers to his common-law wife in a later supplement. *See* Docket 1-1 at 4-6, 22; Docket 7-1 at 6; Docket 17 at 1. For screening purposes, the court assumes that Milk is referring to the same person.

"[substance] usage while on parole wasn't severe enough for them [to] help [him]." *Id.* at 6. Because DeGroot claimed that Glory House had no open beds until July, Milk was required to spend further time in the State Penitentiary. *Id.* Milk claims that his fiancée called Glory House and was told by a counselor that the waiting list is rarely over two months and that she called the Arch and was told that they "accept 'pretty much everyone' " and they do not "deny anyone for 'not enough drug and alcohol use.' " *Id.* at 5-6. DeGroot recommended Milk speak to his Parole Officer, Josh Kulm, or to the Risk Manager, Travis Ripperda. *Id.* at 6. Milk asked if these issues were caused by "that stupid assessment [he] altered by lying on 7 years ago[,]" and DeGroot replied, "Probably, I don't know. I don't get it either." *Id.* Milk wrote a letter to Ripperda and claims that he received no response and has not heard from him directly since.[2] *Id.* He did not write to Kulm because Kulm never responded to a previous letter and because DeGroot told him that Kulm would "do whatever [Ripperda] wanted to and probably not respond." *Id.*

In his February 17, 2023, letter to Ripperda, Milk requested that his System Risk Level assessment be reviewed because of the circumstances of his August 2016 evaluation and his good behavior while incarcerated and on parole since then. *Id.* at 15-17. Ripperda responded that Milk's assessment scores "reflect historical information and cannot be lowered" and that he would remain at System Risk Level 3 classification. *Id.* at 18. Milk replied in another

---

[2] Although Milk claims that he received no response to his letter and that he has not heard directly from Ripperda since, he includes with his complaint his letter to Ripperda, a one-page response from Ripperda discussing the issue, and his reply to Ripperda's response. *See* Docket 1-1 at 6, 15-21.

letter, asking the basis of this historical information and arguing that the "truly violent people" he is housed with either have not undergone System Level Risk assessments or have scores of 0 or 1. *Id.* at 19-21. In this letter and in a later letter written to Senior Parole Officer Ken Schaaf, Milk claims that he is entitled to a review or reassessment of his System Risk Level score under DOC policy. *Id.* at 21, 27.

Milk filed a grievance regarding this issue, and he received an Informal Remedy Response on March 9, 2023, denying his request for a reassessment. *Id.* at 14. In this denial, Milk was informed that "there is no evidence that [he] w[as] advised to exaggerate" and that "[r]eassessment is taken into action if there is more information to add." *Id.* Although Milk did not attach his Administrative Remedy Request following the Informal Remedy Response, he attaches an appeal of his grievances that he submitted to South Dakota Secretary of Corrections Kellie Wasko that references his Administrative Remedy Request. *Id.* at 22. In his appeal, Milk asked to have his System Risk Level score either reassessed or reduced to zero and inquired about the change in his parole plan from being home on parole to being sent to Glory House. *Id.* Wasko denied the appeal and wrote that she "agree[d] with the recommendations put forth by classification staff and the subsequently approved parole plan." *Id.* at 23.

Milk was released on parole on April 20, 2023, and "forced to go to a Christian based transitional house called 'Washed Clean[.]' " Docket 17 at 1. He claims in a supplement filed after his initial complaint that Parole Officer Aileen Winters, Parole Officer Kayla Oelkers, and Schaaf all previously deemed his

6

house "suitable, safe and positive" for his parole but that he was placed at Washed Clean in retaliation for filing this lawsuit. *Id.* Although Milk participated in all programming at Washed Clean, he was terminated for "[p]utting [his] family before God and [himself]" and subsequently had his parole revoked. *Id.* Milk claims that his termination and parole revocation show "the blatant, ludicrous retaliation by the defendants." *Id.* He claims that both Parole Officer Jake Anderson and Regional Supervisor J.C. Smith told him that "[p]utting [his] family before God and [himself]" was the reason provided by Washed Clean owner Craig Nichols for his termination. *Id.* He also claims that Anderson repeated this reason for termination to his common-law wife and his mother-in-law. *Id.* According to the parole violation report submitted by Milk, he was terminated from Washed Clean on or about May 17, 2023, because Nichols felt he "wasn't putting in the adequate effort within the program[.]" Docket 7-1 at 3. Because there were no available structured housing options with immediate openings, Milk was returned to the State Penitentiary for a parole revocation. *Id.*

Milk submitted a letter he wrote to Brad Lewandowski, the Executive Director of Parole Services, in which he explains the circumstances of his termination from Washed Clean. *Id.* at 4-7; Docket 22. He claims that he had a conversation with Nichols in which he was told that "God comes first before all else" and that it was "not enough" to merely be a Christian and a good person. Docket 7-1 at 4. After this conversation, Nichols took an "adversarial role" but Nichols, Nichols' wife, and Washed Clean staff provided no indication to Milk "that there was any kind of problem." *Id.* Milk attended Washed Clean's

evening programming every day, which included group bible study, AA or NA meetings, house meetings, and church, except on Tuesdays and Thursdays when he attended separate substance abuse training. *See id.* at 5. Nichols told Milk that no other parolees had to attend separate substance abuse programming because their Parole Officers considered Washed Clean programming sufficient and to ask Anderson if Washed Clean's programming would suffice. *Id.* Milk asked Anderson if he could attend Washed Clean programming instead of his separate substance abuse programming, and Anderson refused this request. *Id.* Although Milk relayed this conversation to Nichols, he states that Nichols did not seem to believe him. *Id.*

Milk alleges that the only time he did not follow the rules at Washed Clean was a single instance when his granddaughter had a fever of 101 degrees and he was late for curfew because he took her to the emergency room. *Id.* He also alleges that he called Nichols and Jen, a staff member at Washed Clean, before the curfew and informed them of the situation, and they replied, "No problem, hope everything is OK." *Id.* Milk had previously asked permission from Anderson and Nichols to watch his granddaughter for 10-12 hours a day while his wife was at work, and they both approved of this request. *Id.* at 6.

Milk states that he has always done very well on parole when released to his home and has been a well-behaved inmate when incarcerated. Docket 1-1 at 5-6. Milk alleges that his System Risk Level assessment and parole issues are "part of the ongoing harassment and retaliation being perpetrated by the defendants and spearheaded by defendant Ripperda." *Id.* at 5. He alleges that the difficulties he has faced are "[r]etribution for the grievances, administrative

remedies, appeals, kites, and letters" he has written to prison administrators and lawmakers. *Id.* Milk states that he did not receive a response to many of his grievances and inquiries. *See id.* at 5-6.

Milk sues Straatmeyer, Ripperda, the System Risk Management Team and Other Unknown Persons and/or Entities, DeGroot, Former State Penitentiary Warden Darin Young, Former Secretary of Corrections Denny Kaemingk, Former Secretary of Corrections Mike Leidholt, the Former Unknown Director of Prisons, and the DOC for his System Risk Level 3 "High Risk Violent Offender" classification in August 2016 and his subsequent imprisonment from July 2017 to December 13, 2019. *Id.* at 9-10. He sues Ripperda, System Management Team and Other Unknown Persons and/or Entities, DeGroot, State Penitentiary Warden Teresa Bittinger, Former State Penitentiary Warden Daniel Sullivan, Smith, Secretary of Corrections Kellie Wasko, Director of Prisons Amber Pirraglia, Kulm, and the DOC for sustaining his System Risk Level 3 classification upon his readmission into custody on December 9, 2022, and his subsequent imprisonment since then. *Id.* at 11-12. Milk brings claims for violation of his Fourteenth Amendment procedural and substantive due process rights, his Fourteenth Amendment right to equal protection of the laws, and his right to be free from false imprisonment in violation of the Eighth Amendment against both sets of defendants. *Id.* at 9-12.

In his amended complaint, Milk brings claims against Oelkers, Anderson, and Lewandowski, although he does not indicate which claims he brings against these defendants. Docket 22. Construing his complaint liberally, Milk brings all claims in his original complaint against these three defendants. *See*

9

*id.* Milk sues all defendants in their individual and official capacities. Docket 1-1 at 9-12; Docket 20 at 1. Milk asks this court to order his "immediate or speedier release into the community[.]" Docket 21. He also asks this court for a declaration that his classification "as a System Risk Level 3 'High Risk Violent Offender' without any form of Due Process" and the DOC's unjust treatment of him are unconstitutional. *Id.* He seeks "$300,000 per defendant, per claim for all 8 claims due to the emotional pain, suffering, expense, inconvenience, mental anguish, loss of time, loss of enjoyment of life, sensory deprivation, deprivation of intellectual stimulation, lack of exercise, restricted diet, wounded sensibilities, oppression, etc." *Id.* (emphasis omitted). He also seeks an additional "$300,000 in [punitive] damages per defendant, per claim for all 8 claims to punish the defendants for their unlawful and egregious conduct and hopefully deter its repetition." *Id.* (emphasis omitted).

### B.     Legal Background

The court must assume as true all facts well pleaded in the complaint. *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 36 (8th Cir. 1995). Pro se and civil rights complaints must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted); *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004) (citation omitted). Even with this construction, "a *pro se* complaint must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (citation omitted); *see also Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013) (per curiam) (citation omitted).

10

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). If it does not contain these bare essentials, dismissal is appropriate. *See Beavers v. Lockhart*, 755 F.2d 657, 663-64 (8th Cir. 1985) (citation omitted) (explaining that a district court does not err when it dismisses a claim based on vague allegations or unsupported generalizations). *Twombly* requires that a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true[.]" 550 U.S. at 555 (internal citation and footnote omitted); *see also Abdullah v. Minnesota*, 261 F. App'x 926, 927 (8th Cir. 2008) (per curiam) (noting that a "complaint must contain either direct or inferential allegations respecting all material elements necessary to sustain recovery under some viable legal theory" (citing *Twombly*, 550 U.S. at 554-63)).

Under 28 U.S.C. § 1915A, the court must screen prisoner complaints and dismiss them if they "(1) [are] frivolous, malicious, or fail[] to state a claim upon which relief may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). The court will now assess each individual claim under 28 U.S.C. § 1915A.

### C.    Legal Analysis

#### 1.    Claims Against the State of South Dakota

Milk brings claims against the DOC. Docket 1-1 at 9-12. The Eleventh Amendment bars suit against a state entity, as opposed to a state official,

regardless of whether money damages or injunctive relief is sought. *Cory v. White*, 457 U.S. 85, 90-91 (1982). In determining whether an entity is entitled to Eleventh Amendment immunity, the court examines the powers and characteristics of the entity that was created by state law to determine if it in reality is acting as the state, the degree of local autonomy and control exercised by the entity, and whether the funds to pay an award are derived from the state treasury. *Greenwood v. Ross*, 778 F.2d 448, 453 (8th Cir. 1985) (citing *Laje v. R.E. Thomason Gen. Hosp.*, 665 F.2d 724, 727 (5th Cir. 1982)). According to South Dakota statute, the DOC was created by the state legislature. *See* SDCL § 1-15-1.2. The DOC is an arm of the state of South Dakota and, as such, is not subject to suit under § 1983. Milk's claims against the DOC are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 2. Statute of Limitations

"Although the statute of limitations is an affirmative defense, a district court may properly dismiss an in forma pauperis complaint . . . when it is apparent the statute of limitations has run." *Myers v. Vogal*, 960 F.2d 750, 751 (8th Cir. 1992) (per curiam) (citations omitted). "[T]he [United States] Supreme Court has instructed courts to apply the most analogous statute of limitations to claims made under § 1983." *Bell v. Gross*, 2021 WL 2336936, at *2, 2021 U.S. Dist. LEXIS 107270, at *4 (D.S.D. June 8, 2021) (citing *Wilson v. Garcia*, 471 U.S. 261, 266-68 (1985)). "In South Dakota, a specific statute provides that civil rights actions must be brought within three years after the alleged constitutional deprivation occurred or the action will be barred." *Bell v. Fowler*, 99 F.3d 262, 266 (8th Cir. 1996) (citing SDCL § 15-2-15.2).

12

Milk alleges constitutional deprivations that began in August 2016 and continue to this day. *See* Docket 1-1 at 4-12; Docket 17 at 1-2. Milk filed this lawsuit on April 21, 2023. *See* Docket 1. Thus, under SDCL § 15-2-15.2, Milk cannot bring claims for constitutional deprivations that occurred before April 21, 2020. South Dakota "ha[s] not officially adopted the equitable tolling doctrine for civil cases[.]" *In re Estate of French*, 956 N.W.2d 806, 811 (S.D. 2021) (citing *Anson v. Star Brite Inn Motel*, 788 N.W.2d 822, 825 n.2 (S.D. 2010)); *see also Bourassa v. United States*, 581 F. Supp. 3d 1188, 1198-1200 (D.S.D. 2022) (discussing the South Dakota equitable tolling standard as applied to a *Bivens* claim). "The threshold for consideration of equitable tolling is inequitable circumstances not caused by the plaintiff that prevent the plaintiff from timely filing." *In re Estate of French*, 956 N.W.2d at 811-12 (quoting *Anson*, 788 N.W.2d at 826).

Here, Milk makes no allegations of inequitable circumstances that prevented him from timely filing this lawsuit. He alleges that he did not know of the significance of his risk assessment until approximately a year later, but he states that he learned of the risk assessment's impact on his classification in 2017, well more than three years before he filed this lawsuit. *See* Docket 1-1 at 4. Thus, he makes no showing of inequitable circumstances that prevented him from bringing claims within the statute of limitations.

This court construes Milk as bringing three sets of claims in his amended complaint. He brings claims regarding his August 2016 risk assessment and subsequent incarceration from July 2017 to December 13, 2019, claims regarding his readmission into custody on December 9, 2022,

13

through the present day, and claims regarding his parole placement at Washed Clean, his termination from Washed Clean, and his parole revocation following his termination. *See* Docket 1-1 at 9-12; Docket 17 at 1-2. More than three years have passed since December 13, 2019, and Milk's first set of claims is properly dismissed under *Myers*. *See* 960 F.2d at 751 (citations omitted); *see also Jones v. Bock*, 549 U.S. 199, 215 (2007) ("If the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim; that does not make the statute of limitations any less an affirmative defense[.]"). Thus, Milk's first set of claims regarding his August 2016 risk assessment and subsequent incarceration from July 2017 to December 13, 2019, are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 3.    Official Capacity Claims for Money Damages

Milk brings claims against all remaining defendants in their official capacities. *See* Docket 1-1 at 9-12; Docket 20 at 1. All remaining defendants are employees of the state of South Dakota. *See* Docket 1-1 at 9-12; Docket 20 at 1. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Thus, it is a suit against the state itself. While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties, . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Id.* at 66.

The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. *Id.* But "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983" and thus amenable to suit. *Id.* at 71 n.10 (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). Here, Milk requests both money damages and injunctive relief. Docket 21 at 1. The state of South Dakota has not waived its sovereign immunity. Thus, Milk's claims against all remaining defendants in their official capacities for money damages are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

### 4.   Unlawful Incarceration Claims

Milk alleges that he has been unlawfully incarcerated and that his parole has been unlawfully revoked. Docket 1-1 at 9-12; Docket 17 at 1-2. As the Supreme Court has noted, "habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983." *Heck v. Humphrey*, 512 U.S. 477, 481 (1994) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 488-90 (1973)). Further, "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a plaintiff must show "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into

15

question by a federal court's issuance of a writ of habeas corpus[.]" *Id.* at 486-87.

To the extent that Milk challenges the fact or duration of his confinement or seeks damages for allegedly unconstitutional conviction or imprisonment, his exclusive remedy is a habeas corpus petition. Milk states that "the relief [he] seek[s] with this 1983 claim is in *no* way a challenge to the validity of [his] conviction or sentence[.]" Docket 1-1 at 13; *see also* Docket 21 at 1. Regardless of this assertion, Milk's second set claims asserts that he has been deprived of his "liberties via false imprisonment from December 9, 2022 – Present[.]" Docket 1-1 at 11. The Eighth Circuit Court of Appeals has stated that *Heck*'s holding applies to inmates incarcerated for parole revocations. *See Newmy v. Johnson*, 758 F.3d 1008, 1011 (8th Cir. 2014) (finding that a former inmate's § 1983 claim was barred under *Heck* after he was released from custody because a judgment in favor of the plaintiff "would necessarily imply the invalidity of the parole revocation and extended incarceration"); *Flying Horse v. Hansen*, 691 F. App'x 299, 300 (8th Cir. 2017) (per curiam) ("To the extent [the plaintiff] sought damages for his confinement after the revocation of his parole, we conclude that *Heck* applies, because . . . a judgment in his favor would render the parole revocation invalid.").

The only form of injunctive relief sought by Milk is his "immediate or speedier release into the community[.]" *See* Docket 21 at 1. Milk's exclusive remedy for release is a habeas petition. *See Heck*, 512 U.S. at 481 (citing *Preiser*, 411 U.S. at 488-90). Thus, Milk's official capacity claims for injunctive relief are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and

1915A(b)(1). Milk's claims that his System Risk Level classification violated his Fourteenth Amendment procedural due process and equal protection rights after he was readmitted into DOC custody on December 9, 2022, are not barred under *Heck*, but his claims that his incarceration on December 9, 2022, and his incarceration following his parole revocation violated his Fourteenth Amendment substantive due process rights and Eighth Amendment rights are barred because he has made no showing that his incarceration on December 9, 2022, or his parole revocation has been reversed, expunged, declared invalid, or called into question. *See id.* at 486-87.

Similarly, as discussed below, this court construes Milk as bringing First Amendment retaliation claims. To the extent that Milk alleges that his parole revocation was motivated by unconstitutional retaliation, that claim is barred under *Heck* because he has made no showing that his parole revocation has been reversed, expunged, declared invalid, or called into question. *See id.* Milk's Fourteenth Amendment substantive due process claims, Eighth Amendment claims, and First Amendment retaliation claims regarding his December 9, 2022, incarceration and his parole revocation are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

To the extent that Milk brings claims for his alleged incarceration past his parole date, *see* Docket 1-1 at 5, those claims are also barred under *Heck*. In *Newmy*, the Eighth Circuit explained that *Heck* "impose[s] a universal favorable termination requirement on all § 1983 plaintiffs attacking the validity of their conviction or sentence." *Newmy*, 758 F.3d at 1012 (quoting *Deemer v. Beard*, 557 F. App'x 162, 166 (3d Cir. 2014)). "[T]his rule could preclude a

17

damages remedy for an inmate who is detained for only a short time with limited access to legal resources, but that is a consequence of the principle barring collateral attacks that was applied in *Heck*." *Id.* Thus, Milk's claims for damages regarding his alleged incarceration past his parole date are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 5.    Individual Capacity Claims

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

> Thus, each Government official . . . is only liable for his or her own misconduct. As we have held, a supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.

*Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (cleaned up). Milk's individual capacity claims must allege that each individual defendant either participated in the unconstitutional conduct or caused the conduct to occur through a failure to train or supervise the offending actor. *See id.*

### a.    Fourteenth Amendment Procedural Due Process Claim

Milk alleges that defendants violated his Fourteenth Amendment procedural due process rights when they failed to provide him with an opportunity to have his System Risk Level score reviewed or to appeal his score after he was readmitted into DOC custody on December 9, 2022. Docket 1-1 at 11.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Smith v. McKinney*, 954 F.3d 1075, 1079 (8th Cir. 2020) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). "Once a liberty interest is established, the next question is what process is due." *Id.* (quoting *Williams v. Norris*, 277 F. App'x 647, 649 (8th Cir. 2008) (per curiam)). This question need only be answered if the inmate can establish a constitutionally protected liberty interest. *Id.* (citing *Wilkinson*, 545 U.S. at 221). "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Id.* (quoting *Wilkinson*, 545 U.S. at 221). "[I]nmates possess a state-created liberty interest in avoiding assignment to conditions of confinement that 'impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Id.* at 1080 (second alteration in original) (quoting *Wilkinson*, 545 U.S. at 223). The Supreme Court has applied this principle, first articulated in *Sandin v. Conner*, 515 U.S. 472 (1995), to inmate assignment to higher security prisons. *See Wilkinson*, 545 U.S. at 223.

The Eighth Circuit has explained that there is no "established 'baseline from which to measure what is atypical and significant in any particular prison system[.]' " *Smith*, 954 F.3d at 1081 (quoting *Wilkinson*, 545 U.S. at 223). But the Eighth Circuit has "affirmatively held what does *not* constitute an atypical or significant deprivation." *Id.* For instance, "a demotion to segregation, even without cause, is not itself an atypical and significant hardship." *Id.* at 1082

19

(quoting *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003)). An inmate "must show some difference between his new conditions in segregation and the conditions in the general population which amounts to an atypical and significant hardship." *Id.* (quoting *Phillips*, 320 F.3d at 847); *see also Kennedy v. Blankenship*, 100 F.3d 640, 642-43 (8th Cir. 1996) (collecting post-*Sandin* cases in which deprivations were upheld as not atypical and significant hardships).

Here, Milk alleges that he was "forced to sit in a maximum security prison on 23 hour per day lockdown" past his actual release date. Docket 1-1 at 5. He alleges that he has been placed on the most restrictive form of parole while released. *Id.* at 4. He also alleges that these restrictions were caused by his System Risk Level 3 classification. *See id.* at 4-5. These conditions likely fit into the category of cases cited by the Eighth Circuit in *Kennedy* as deprivations that were not atypical and significant hardships. *See* 100 F.3d at 642-43. But this determination relies on a comparison of Milk's conditions of confinement with the conditions of the State Penitentiary general population and of State Penitentiary parolees, which requires facts not currently before the court. *See Smith*, 954 F.3d at 1082 (citing *Phillips*, 320 F.3d at 847). Thus, this court cannot say with certainty at this early phase of litigation that Milk's conditions of confinement and conditions of parole are not an atypical and significant hardship, and the court will assume that Milk has a liberty interest in avoiding these conditions caused by his System Risk Level 3 classification for purposes of screening.

In the context of administrative segregation, the process due is "informal" and "requires only 'some notice of the reasons for the inmate's placement . . . and enough time to prepare adequately for the administrative review.' " *Spann v. Lombardi*, 65 F.4th 987, 992 (8th Cir. 2023) (omission in original) (quoting *Westefer v. Neal*, 682 F.3d 679, 684 (7th Cir. 2012)). "An inmate must be given 'an opportunity to present his views' to a neutral decisionmaker, but is not entitled to a hearing with the inmate present." *Id.* (quoting *Westefer*, 682 F.3d at 685). "Informal due process also requires a periodic review of placement in administrative segregation." *Id.* (citing *Westefer*, 682 F.3d at 686). Periodic reviews must also be meaningful. *Williams v. Hobbs*, 662 F.3d 994, 1009 (8th Cir. 2011). In *Hobbs*, the Eighth Circuit explained that it forbids according "undue weight . . . to past facts" such that an inmate "would always . . . remain in [administrative segregation] in light of his past transgressions." *Id.* at 1008.

Milk alleges that he is supposed to have his System Risk Level score reviewed under DOC policy and that DOC officials refuse to conduct a reassessment. Docket 1-1 at 21, 27. Although he has been able to inquire about his System Risk Level score, he has been told that his numbers "reflect historical information and cannot be lowered[.]" *Id.* at 18. Although *Spann* and *Hobbs* discussed the process due for administrative segregation and subsequent review for an inmate's return to the general population, this court finds these cases instructive. Assuming that Milk has a liberty interest in his System Risk Level score, the process due to protect that interest is an informal and periodic review that must also be meaningful. *See Spann*, 65 F.4th at 992; *Hobbs*, 662 F.3d at 1008-09. According to Ripperda's response to Milk's letter

regarding his System Risk Level score, his classification cannot be changed. Docket 1-1 at 18. Thus, any review of Milk's classification is not meaningful, and he alleges facts sufficient to state a claim for violation of his Fourteenth Amendment procedural due process rights.

Milk must allege that each individual defendant either participated in the unconstitutional conduct or caused it to occur through a failure to train or supervise. *See Parrish*, 594 F.3d at 1001. Milk alleges that Ripperda is responsible for his inability to have his System Risk Level score reassessed and that Wasko affirmed Ripperda's actions and denied Milk's appeal on this issue. *See* Docket 1-1 at 15-23. Although Milk wrote to other DOC officials regarding his System Risk Level and received responses from some of them, he does not allege that these other officials were responsible for his System Risk Level score and his inability to have his score reviewed either directly or through a failure to train or supervise. *See, e.g.*, *id.* at 24-27. Thus, Milk's Fourteenth Amendment procedural due process claim regarding his System Risk Level score since December 9, 2022, against Ripperda and Wasko in their individual capacities survives § 1915A screening, but his Fourteenth Amendment procedural due process claim regarding his System Risk Level score since December 9, 2022, against all other remaining defendants in their individual capacities is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

### b.    Fourteenth Amendment Equal Protection Claims

Milk alleges that defendants violated his Fourteenth Amendment equal protection rights when they failed to provide him with an opportunity to have

his System Risk Level score reviewed or to appeal his score after he was readmitted into DOC custody on December 9, 2022. *Id.* at 12. Construing his complaint liberally, he also brings an equal protection claim for his termination from Washed Clean and the subsequent revocation of his parole, which he alleges was religiously motivated. *See* Docket 7-1 at 4-7; Docket 17 at 1-2.

The Equal Protection Clause of the Fourteenth Amendment requires the government to "treat similarly situated people alike," a protection that applies to prisoners. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 984 (8th Cir. 2004) (quoting *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999)). The Eighth Circuit has explained that for a prisoner to prevail on an equal protection claim, he "must show that he is treated differently from similarly-situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008) (citations and internal quotation omitted). "Religion is a suspect classification." *Id.* at 816 (citing *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1016 (8th Cir. 2006)). An inmate can also bring an equal protection claim for different treatment that is not based upon a suspect classification or a fundamental right if he can show that "similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Phillips*, 320 F.3d at 848 (quoting *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998)). The inmate must also show "intentional or purposeful discrimination." *Id.* (quoting *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994)).

Here, Milk alleges facts sufficient to state a claim for violation of his Fourteenth Amendment equal protection rights for the failure to review or reassess his System Level Risk score after December 9, 2022. Although he does not claim that his different treatment is based on a suspect classification or a fundament right, he claims that similarly situated violent inmates are either not required to take a System Level Risk assessment or have low System Level Risk scores. Docket 1-1 at 7, 20. He claims that this different treatment bears no rational relationship to a legitimate penal interest and that the DOC is purposefully targeting him for different treatment. *See id.* at 19-21.

Again, Milk must allege that each individual defendant either participated in the unconstitutional conduct or caused it to occur through a failure to train or supervise under *Parrish. See* 594 F.3d at 1001. Milk alleges that Ripperda is responsible for his inability to have his System Risk Level score reassessed and that Wasko denied his appeal on this issue. *See* Docket 1-1 at 15-23. Although Milk made other DOC officials aware of his System Risk Level, he does not allege that they were responsible either directly or through a failure to train or supervise. *See, e.g., id.* at 24-27. Thus, Milk's Fourteenth Amendment equal protection claim regarding his System Risk Level score since December 9, 2022, against Ripperda and Wasko in their individual capacities survives § 1915A screening, but his Fourteenth Amendment equal protection claim regarding his System Risk Level score since December 9, 2022, against all other remaining defendants in their individual capacities is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

### c.   First Amendment Retaliation Claims

Milk alleges that his difficulties with his System Risk Level assessment and parole are retaliation by DOC officials for the "grievances, administrative remedies, appeals, kites, and letters" he has written to prison administrators and lawmakers. Docket 1-1 at 5. He also alleges that he was terminated from Washed Clean and had his parole revoked in retaliation for filing this lawsuit. Docket 17 at 1. Construing his complaint liberally, Milk brings claims for retaliation in violation of his First Amendment rights. *See* Docket 1-1 at 5-6; Docket 17 at 1. As discussed above, his First Amendment retaliation claim for the revocation of his parole is barred under *Heck. See* 512 U.S. at 486-87.

To allege a First Amendment retaliation claim, a plaintiff must "show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson County*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). "[T]he plaintiff must show the official took the adverse action because the plaintiff engaged in the protected [activity]." *Revels*, 382 F.3d at 876. "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007) (citing *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994)).

Here, Milk has alleged facts sufficient to state a First Amendment retaliation claim for his System Risk Level assessment and parole difficulties. He alleges that he has filed grievances, written to government officials, and filed

a lawsuit, both of which are protected activities. *See* Docket 1-1 at 5; Docket 17 at 1; *Lewis*, 486 F.3d at 1029 (citing *Dixon*, 38 F.3d at 379). He alleges that DOC officials have refused to reassess his System Risk Level score, causing him to be incarcerated under more severe conditions, and required him to go to a transitional facility while on parole. Docket 1-1 at 5-6; Docket 17 at 1. He also alleges that these actions were motivated at least in part by his grievances and lawsuit. Docket 1-1 at 5-6; Docket 17 at 1.

As above, Milk's individual capacity claims must allege that each individual defendant either participated in the unconstitutional conduct or caused it to occur through a failure to train or supervise. *See Parrish*, 594 F.3d at 1001. Milk alleges "ongoing harassment and retaliation" that is "perpetrated by the defendants and spearheaded by Ripperda." Docket 1-1 at 5. As discussed above, Milk only alleges that Ripperda and Wasko were responsible, either directly or through a failure to train or supervise, for his System Risk Level assessment issues. *See id.* at 15-23.

Milk describes "a personal vendetta" on the part of Ripperda and his Risk Management Team that now involves "Kulm, DeGroot, and the other defendants." *Id.* at 6. Milk alleges that DeGroot took part in his parole placement at Washed Clean and that Kulm did not respond to his letter inquiring as to his parole issues. *Id.* He also alleges that DeGroot told him that Kulm would "do whatever [Ripperda] wanted to" regarding his parole. *Id.* Although Milk claims that other defendants are involved in the retaliation, he makes no allegations as to their participation. *See id.* at 5-6. Thus, Milk's First Amendment retaliation claim regarding his System Risk Level score since

26

December 9, 2022, against Ripperda and Wasko in their individual capacities and his First Amendment retaliation claim regarding his parole placement at Washed Clean against Ripperda, DeGroot, and Kulm in their individual capacities survive § 1915A screening, but his First Amendment retaliation claims regarding his System Risk Level score since December 9, 2022, and regarding his parole placement at Washed Clean against all other remaining defendants in their individual capacities are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

To the extent that Milk seeks to bring a First Amendment retaliation claim for his termination from Washed Clean, he fails to allege that any government official took adverse action against him. He claims that Nichols, the owner of Washed Clean, terminated him from Washed Clean and that this termination and his subsequent parole revocation show "the blatant, ludicrous retaliation by the defendants." Docket 17 at 1. But he does not name Nichols as a defendant in this lawsuit, and he does not allege that any government official participated in his termination from Washed Clean. *See id.* He claims that Anderson and Smith informed him and his family members of the reason that Nichols provided for his termination, but this does not constitute adverse action by Anderson or Smith. *See id.* And while Milk's parole was revoked as a result of his termination from Washed Clean, his First Amendment retaliation claim for this parole revocation is barred under *Heck*. *See* 512 U.S. at 486-87. Thus, Milk's First Amendment retaliation claims for his termination from Washed Clean and his subsequent parole revocation are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

27

### d.   First Amendment Establishment Clause Claim

Milk alleges that he was "forced to go to a Christian based transitional house called 'Washed Clean[.]' " Docket 17 at 1. Construing his complaint liberally, Milk brings a claim for violation of his First Amendment Establishment Clause rights. *See id.*

"[A]t a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise[.]" *Lee v. Weisman,* 505 U.S. 577, 587 (1992) (citing *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984)). In order to have standing to bring an Establishment Clause claim, a plaintiff may either have standing as a taxpayer or establish "an injury of direct and unwelcome personal contact with the alleged establishment of religion." *Patel*, 515 F.3d at 816 (citations and internal quotation omitted). "Prisoners may establish an injury if they 'allege they altered their behavior and had direct, offensive, and alienating contact with' a government-funded religious program." *Id.* at 817 (quoting *Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.,* 509 F.3d 406, 419 (8th Cir. 2007)).

Milk alleges facts sufficient to state a claim for violation of his First Amendment Establishment Clause rights. He alleges that he was forced to go to Washed Clean, a Christian transitional facility. Docket 17 at 1. Although Milk stated in a letter to Lewandowski that he is a Christian, he also stated that Nichols told him he was not a "good fit" because he "basically wasn't 'Christian enough.' " Docket 7-1 at 4. Thus, he alleges that he was terminated from Washed Clean for religious differences. *See id.* Milk does acknowledge one incident where he violated a curfew rule at Washed Clean to care for his

28

granddaughter, but he alleges that he had permission from Nichols and another Washed Clean staff member to do so. *Id.* at 5.

Although Milk does not directly state that he altered his behavior as a result of being sent to Washed Clean, he does allege that he tried to follow the restrictions imposed on him, and his allegations that he was required to follow a religious program that did not fully align with his beliefs could constitute direct, offensive, and alienating contact with Washed Clean's religious requirements. *See id.* at 4-5; *Patel*, 515 F.3d at 817 (citation omitted). He alleges that Washed Clean required him to alter his behavior and that when he failed to sufficiently comply with religious requirements that did not comply with his own beliefs, he was terminated from Washed Clean. *See* Docket 7-1 at 4-5. Thus, he alleges a violation of his First Amendment Establishment Clause rights.

Milk's individual capacity claims must allege that each individual defendant either participated in the unconstitutional conduct or caused it to occur through a failure to train or supervise under *Parrish*. *See* 594 F.3d at 1001. Milk alleges that he was "forced" to go to Washed Clean for parole, but he does not specify which defendants forced him to go to Washed Clean. *See* Docket 17 at 1. As discussed above, Milk alleges that Ripperda, DeGroot, and Kulm were responsible for his parole placement at Washed Clean. *See* Docket 1-1 at 5. Thus, Milk's First Amendment Establishment Clause claim against Ripperda, DeGroot, and Kulm in their individual capacities survives § 1915A screening. Milk's First Amendment Establishment Clause claim against all

29

other remaining defendants is dismissed without prejudice under 28 U.S.C.
§§ 1915(e)(2)(B)(ii) and 1915A(b)(l).

### III.    Motion for a Preliminary Injunction and Restraining Order

Milk has submitted a proposed order to show cause for a preliminary
injunction and a temporary restraining order. Docket 15. This court construes
Milk's filing as a motion for a preliminary injunction and a temporary
restraining order. *See id.*

"A preliminary injunction is an extraordinary remedy[.]" *Roudachevski v.
All–Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also Hughbanks
v. Dooley*, 788 F. Supp. 2d 988, 992 (D.S.D. 2011) (citing *Munaf v. Geren*, 553
U.S. 674, 689-90 (2008)). "The burden of proving that a preliminary injunction
should be issued rests entirely with the movant." *Goff v. Harper*, 60 F.3d 518,
520 (8th Cir. 1995) (citation omitted).

When ruling on a motion for a preliminary injunction, the court
considers "(1) the threat of irreparable harm to the movant; (2) the state of the
balance between this harm and the injury that granting the injunction will
inflict on other parties litigant; (3) the probability that movant will succeed on
the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109, 113 (8th Cir. 1981) (en banc). Since *Dataphase*, the Eighth
Circuit has "observed that the 'likelihood of success on the merits is most
significant.' " *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting
*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir.
2012)).

Further, the Eighth Circuit has held that "the failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction[.]" *Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996) (quoting *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir. 1987)). To demonstrate irreparable harm, a plaintiff must show that the injury is certain, great, and "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Packard Elevator v. Interstate Com. Comm'n*, 782 F.2d 112, 115 (8th Cir. 1986) (internal quotations omitted). A "plaintiff must make a showing of actual, substantial harm resulting from the alleged infringement." *Gard v. Dooley*, 2014 WL 4243586, at *1, 2014 U.S. Dist. LEXIS 118740, at *3 (D.S.D. Aug. 26, 2014) (quoting *Travelers Express Co. v. Transaction Tracking Techs., Inc.*, 305 F. Supp. 2d 1090, 1095 (D. Minn. 2003)).

Moreover, "in the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.' " *Goff*, 60 F.3d at 520 (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)). And "for an injunction to issue 'a right must be violated' and . . . 'the court must determine' whether 'a cognizable danger of future violation exists and that danger must be more than a mere possibility.' " *Id.* at 521 (quoting *Rogers*, 676 F.2d at 1214).

Here, it is too early in the case to determine that Milk is likely to prevail on the merits. Milk's allegations of retaliation and other constitutional deprivations regarding his System Risk Level assessment and parole conditions

31

are serious allegations. But at this stage, they are supported only by his complaint and various supplements. Further, he seeks a preliminary injunction that would in part order "the reinstatement of parole and [his] immediate release[,]" Docket 15 at 1, a form of relief that is barred under *Heck*. *See* 512 U.S. at 481 (citing *Preiser*, 411 U.S. at 488-90). As a result, his motion for a preliminary injunction is denied at this time.

Milk also moves for a temporary restraining order. *See* Docket 15. Under the Federal Rules of Civil Procedure, a court may issue a temporary restraining order without notice to the adverse party only if "specific facts . . . clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition[.]" Fed. R. Civ. P. 65(b)(1)(A). This court denies Milk's motion for a temporary restraining order for the same reason it has denied the motion for preliminary injunction.

Thus, it is ORDERED:

1.    That Milk's motion for leave to amend his complaint, Docket 12, is granted.

2.    That Milk's claims against the DOC are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

3.    That Milk's claims regarding his August 2016 risk assessment and subsequent incarceration from July 2017 to December 13, 2019, are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

4.    That Milk's claims against all defendants in their official capacities for money damages are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

5.    That Milk's official capacity claims for injunctive relief are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

6.    That Milk's Fourteenth Amendment procedural due process claim regarding his System Risk Level score since December 9, 2022, against Ripperda and Wasko in their individual capacities survives § 1915A screening.

7.    That Milk's Fourteenth Amendment equal protection claim regarding his System Risk Level score since December 9, 2022, against Ripperda and Wasko in their individual capacities survives § 1915A screening.

8.    That Milk's First Amendment retaliation claim regarding his System Risk Level score since December 9, 2022, against Ripperda and Wasko in their individual capacities survives § 1915A screening.

9.    That Milk's First Amendment retaliation claim regarding his parole placement at Washed Clean against Ripperda, DeGroot, and Kulm in their individual capacities survives § 1915A screening.

10.   That Milk's First Amendment Establishment Clause claim against Ripperda, DeGroot, and Kulm in their individual capacities survives § 1915A screening.

11. That Milk's remaining claims against all defendants are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

12. That Milk's motion for a preliminary injunction and temporary restraining order, Docket 15, is denied.

13. That the Clerk of Court shall send blank summons forms and Marshal Service Forms (Form USM-285) to Milk so that he may cause the complaint to be served upon defendants Ripperda, Wasko, DeGroot, and Kulm.

14. That Milk shall complete and send the Clerk of Court a separate summons and USM-285 form for defendants Ripperda, Wasko, DeGroot, and Kulm. Upon receipt of the completed summons and USM-285 forms, the Clerk of Court will issue the summonses. If the completed summons and USM-285 forms are not submitted as directed, the complaint may be dismissed.

15. The United States Marshal Service shall serve the completed summonses, together with a copy of the complaint (Docket 1), the supplements to the complaint that allege additional facts (Dockets 1-1, 7-1), the filings that constitute Milk's amended complaint (Dockets 12, 12-1, 17, 19, 20, 21, 22), and this order, upon defendants Ripperda, Wasko, DeGroot, and Kulm.

16. Defendants Ripperda, Wasko, DeGroot, and Kulm will serve and file an answer or responsive pleading to the amended complaint on or

before 21 days following the date of service or 60 days if the defendants fall under Fed. R. Civ. P. 12(a)(2) or (3).

17.    Milk will keep the court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the court's Local Rules while this case is pending.

Dated August 2, 2023.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE